**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**BOWLING GREEN DIVISION**

| | | |
|---|---|---|
| RACETECH KY, LLC, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. 1:15-CV-00082-GNS |
| | ) | |
| KENTUCKY DOWNS, LLC AND | ) | |
| ENCORE GAMING, LLC; | ) | |
| Defendants. | ) | |

**ANSWER AND AMENDED COUNTERCLAIMS OF**
**KENTUCKY DOWNS, LLC AND ENCORE GAMING, LLC**

Defendant Kentucky Downs, LLC and Defendant Encore Gaming, LLC by their undersigned counsel, responded to the Complaint filed in this proceeding with their Answer and Counterclaims filed on August 10, 2015 at Docket No. 15. Pursuant to Federal Rule of Civil Procedure 15(a)(1), Defendants have amended certain averments in their Counterclaims and therefore re-file their Answer with their Amended Counterclaims.

**FIRST DEFENSE**

The Complaint fails to state a claim upon which relief can be granted.

**SECOND DEFENSE**

1.      Paragraph 1 of the Complaint is a summary paragraph to which no response is required. To the extent a response is required, the Defendants deny the averments set forth in paragraph 1.

2.      With regard to the averments in the first sentence of paragraph 2 of the Complaint, the Defendants are without sufficient information to form a belief as to the truth of the averments regarding the corporate relationship between RaceTech, LLC and RaceTech KY,

LLC; the Defendants admit that until Spring 2015, the only available option for customers to make pari-mutuel wagers on historical horse races were terminals provided by RaceTech KY, LLC and RaceTech, LLC, or either of them, known as Instant Racing™.  With regard to the averments in the second sentence of paragraph 2 of the Complaint, the Defendants admit that Kentucky Downs was a party to an August 19, 2011, Equipment and License Agreement with RaceTech KY, LLC and offered pari-mutuel wagers on historical horse races through terms under the brand name Instant Racing™.

3.     With regard to paragraph 3 of the Complaint, the Defendants admit that Mr. Reid is a founder of Encore.  The Defendants deny the remaining averments set forth in paragraph 3.

4.     With regard to paragraph 4 of the Complaint, the Defendants admit that Mr. Johnsen is the President of Kentucky Downs and that Mr. Hughes is the General Manager, and Senior Vice President of Kentucky Downs.  The Defendants deny the remaining averments set forth in paragraph 4.

5.     Paragraph 5 of the Complaint sets forth averments to which no response is required.  The Defendants deny that the Plaintiff is entitled to any of the relief sought in the Complaint.

6.     The Defendants are without sufficient information to form a belief as to the truth of the averments set forth in paragraph 6 and therefore deny same.

7.     The Defendants admit the averments set forth in paragraph 7 and further admit that Kentucky Downs also has citizenship in Oklahoma and Texas.

8.     The Defendants admit the averments set forth in paragraph 8.

9.      Paragraph 9 of the Complaint sets forth legal conclusions to which no response is required.  To the extent a response is required, the Defendants are without sufficient information to form a belief as to the truth of the averments set forth in paragraph 9 and therefore deny same.

10.     Paragraph 10 of the Complaint sets forth legal conclusions to which no response is required.  To the extent a response is required, Kentucky Downs admits that it is a Kentucky limited liability company with a principal place of business in Kentucky.  Kentucky Downs denies the remainder of the averments set forth in paragraph 10 and denies that it has undertaken any tortious conduct.

11.     Paragraph 11 of the Complaint sets forth legal conclusions to which no response is required.  To the extent a response is required, Encore Gaming admits that it conducts business in Kentucky.  Encore Gaming denies the remainder of the averments set forth in paragraph 11 and denies that it has undertaken any tortious conduct.

12.     The Defendants admit the averments set forth in paragraph 12.

13.     With regard to paragraph 13 of the Complaint, the Defendants admit that Kentucky Downs, a licensed horse racing association in Kentucky, opened a horse racing track and entertainment complex in Franklin, Kentucky in 1990; hosts one live turf racing meeting each September; hosts year-round simulcasting of races at other race tracks; and offers pari-mutuel wagers on historical horse races through terminals.  The Defendants deny any averments in paragraph 13 that are inconsistent with these admissions.

14.     With regard to paragraph 14 of the Complaint, the Defendants admit that until Spring 2015, the only available option for customers to make pari-mutuel wagers on historical horse races were terminals provided by RaceTech KY, LLC and RaceTech, LLC, or either of them, known as Instant Racing™.  The Defendants are without sufficient information to form a

belief as to the truth of the remainder of the averments set forth in paragraph 14 and therefore deny same.

15. The Defendants admit the averments set forth in paragraph 15.

16. With regard to paragraph 16 of the Complaint, the Defendants deny that Magellan markets Encore Gaming's products and services. The Defendants admit the remaining averments set forth in paragraph 16.

17. With regard to paragraph 17 of the Complaint, the Defendants deny that Mr. Hughes is the Managing Partner of Magellan. The Defendants admit the remaining averments set forth in paragraph 17.

18. With regard to paragraph 18 of the Complaint, the Defendants deny that Mr. Reid is domiciled in Nashville, Tennessee, is an owner of Kentucky Downs, is an officer of Kentucky Downs, and founded Encore Gaming. The Defendants admit the remaining averments set forth in paragraph 18.

19. The Defendants deny the averments set forth in paragraph 19.

20. With regard to paragraph 20 of the Complaint, the document referenced therein speaks for itself.

21. With regard to paragraph 21 of the Complaint, the document referenced therein speaks for itself.

22. With regard to paragraph 22 of the Complaint, the document referenced therein speaks for itself.

23. With regard to paragraph 23 of the Complaint, the document referenced therein speaks for itself.

24. With regard to paragraph 24 of the Complaint, the document referenced therein

speaks for itself.

25.     With regard to paragraph 25 of the Complaint, the document referenced therein speaks for itself.

26.     With regard to paragraph 26 of the Complaint, the document referenced therein speaks for itself.

27.     With regard to paragraph 27 of the Complaint, the document referenced therein speaks for itself.

28.     With regard to paragraph 28 of the Complaint, the document referenced therein speaks for itself.

29.     With regard to paragraph 29 of the Complaint, the document referenced therein speaks for itself.

30.     The Defendants deny the averments set forth in paragraph 30.

31.     The Defendants deny the averments set forth in paragraph 31.

32.     With regard to the averments in the first sentence of paragraph 32 of the Complaint, Defendants admit that some information was provided to Mr. Hughes, Mr. Johnsen, and Mr. Yunker regarding the basic operation of the Instant Racing™ terminals and basic information on how to explain to patrons how to play the games, but are without sufficient information to form a belief as to the truth of who provided the information.  The Defendants deny any other averments in the first sentence.  Defendants deny the averments set forth in the second sentence of paragraph 32.  With regard to the averments in the third sentence of paragraph 32, Defendants admit that Mr. Hughes, Mr. Johnsen, and Mr. Yunker remain involved in historical horse racing at Kentucky Downs.  The Defendants deny any other averments in the third sentence.  With regard to the averments in the fourth sentence of paragraph 32, Defendants

admit that it is possible certain general information regarding the benefits of educating patrons was communicated to Mr. Reid and deny the remaining averments in the fourth sentence of paragraph 32. Defendants deny the averments set forth in the fifth sentence of paragraph 32.

33.     With regard to the averments in the first sentence of paragraph 33 of the Complaint, Defendants admit that a commercially available server containing a library of historical horse races for Instant Racing™ was installed at Kentucky Downs, but are without sufficient information to form a belief as to the truth of who employed the persons who installed it. Defendants deny the remaining averments set forth in the first sentence. Defendants deny the averments in the second sentence of paragraph 33 of the Complaint.

34.     With regard to the averments in paragraph 34 of the Complaint, Defendants admit that Mr. Johnsen was shown the public historical horse racing area, known as the "floor" at Oaklawn Park Race Track in Hot Springs, Arkansas and was shown a work room on a lower floor that was cluttered with machinery, equipment, and papers. Defendants further admit that Mr. Johnsen went to AmTote's building in Hunt Valley, Maryland, where he was in a conference room. Defendants deny the remaining averments in paragraph 34.

35.     With regard to the averments in paragraph 35 of the Complaint, the referenced patent application speaks for itself and Defendants admit that Mr. Johnsen is the President of Kentucky Downs and that he requested that Mr. Enzminger and Mr. Lind be able to visit the historical horse racing facilities at Oaklawn Park. Defendants deny the remaining averments in paragraph 35.

36.     With regard to the averments in the first sentence of paragraph 36 of the Complaint, Defendants admit that when Mr. Enzminger and Mr. Lind visited the historical horse racing facilities at Oaklawn Park, they were doing so with the purpose of wanting to work with

RaceTech KY to develop additional game titles.  Defendants deny the remaining averments in paragraph 36.

37.    With regard to the averments in the first sentence of paragraph 37 of the Complaint, Defendants are without sufficient information to form a belief as to the truth of the averments set forth therein and therefore deny same.  Defendants deny the remaining averments in paragraph 37.

38.    With respect to the averments in paragraph 38 of the Complaint, Defendants admit that the card used for Kentucky Downs' players club rewards program has used the same design and the Kentucky Downs logo, which design was paid for and is owned by Kentucky Downs.  Defendants further admit that the purpose of a players club rewards program is to provide marketing and customer loyalty.  Defendants deny the remaining averments in paragraph 38.

39.    The Defendants deny the averments set forth in paragraph 39.

40.    With regard to the averments in the second sentence of paragraph 40 of the Complaint, Defendants admit that in his capacity as Gaming Manager at Kentucky Downs, Mr. Yunker requested a list of hold percentages/math models for Instant Racing™ game titles from Tim Yelton at AmTote and that on December 22, 2014, Steve Marcinak provided certain spreadsheets to Mr. Yunker.  Defendants deny the remaining averments in paragraph 40.

41.    The Defendants deny the averments set forth in paragraph 41.

42.    With regard to paragraph 42 of the Complaint, the document referenced therein speaks for itself.

43.    With regard to the averments in paragraph 43 of the Complaint, the Defendants admit that until Spring 2015, the only available option for customers to make pari-mutuel wagers

on historical horse races were terminals provided by RaceTech KY, LLC and RaceTech, LLC, or either of them, known as Instant Racing™.

44.     With regard to the averments in the paragraph 44 of the Complaint, Defendants admit that Mr. Reid was a founder of and is the chief executive officer of Encore Gaming. Defendants deny the remaining averments in paragraph 44.

45.     With regard to the averments in paragraph 45 of the Complaint, the referenced document speaks for itself, and Defendants admit that Mr. Lind and Mr. Enzminger work with Encore Gaming.  The Defendants deny the remaining averments set forth in paragraph 45.

46.     With regard to the averments in paragraph 46 of the Complaint, Defendants admit that Mr. Johnsen is the President of Kentucky Downs and that Mr. Hughes is the General Manager and Senior Vice President of Kentucky Downs.  The Defendants deny the remaining averments set forth in paragraph 46.

47.     The Defendants deny the averments set forth in paragraph 47.

48.     With regard to paragraph 48 of the Complaint, the document referenced therein speaks for itself.

49.     With regard to paragraph 49 of the Complaint, the document referenced therein speaks for itself.

50.     The Defendants admit the averments set forth in paragraph 50.

51.     With regard to the averments in paragraph 51 of the Complaint, the Defendants admit that RaceTech KY deactivated the Instant Racing™ terminals at Kentucky Downs on March 29, 2015.  The Defendants deny the remaining averments set forth in paragraph 51.

52.     With regard to the averments in paragraph 52 of the Complaint, the document referenced therein speaks for itself.

53.     With regard to the averments in paragraph 53 of the Complaint, the Defendants admit that Kentucky Downs did not accept the new and materially different terms offered by RaceTech KY, each of which included a demand for a monopolistic exclusivity stating: "Licensee covenants and agrees that during the Term Licensee shall not directly, or indirectly through any affiliate, offer, sell or provide to Licensee Customers or other persons any pari-mutuel based wagering system that is based on historical horse or other type races other than Historical Horse Race System provided by Licensor;" and that the License Agreement was terminated by RaceTech KY effective March 31, 2015.  The Defendants deny the remainder of the averments set forth in paragraph 53.

54.     The Defendants deny the averments set forth in paragraph 54.

55.     The Defendants admit the averments set forth in paragraph 55.

56.     With regard to the first sentence of paragraph 56 of the Complaint, the document referenced therein speaks for itself.  With regard to the remainder of the averments set forth in paragraph 56, purse amounts are a matter of public record, which speaks for itself.

57.     With regard to the averments set forth in paragraph 57, handle amounts are a matter of public record, which speaks for itself.

58.     With regard to the averments set forth in paragraph 58, takeout amounts are a matter of public record, which speaks for itself.

59.     With regard to the averments set forth in paragraph 59, the amount of taxes on pari-mutuel wagers are a matter of public record, which speaks for itself.

60.     Paragraph 60 of the Complaint sets forth a statement to which no response is required.  To the extent a response is required, the Defendants incorporate by reference their responses to paragraphs 1–59 of the Complaint.

61.     With regard to paragraph 61 of the Complaint, the document referenced therein speaks for itself.

62.     The Defendants deny the averments set forth in paragraph 62.

63.     The Defendants deny the averments set forth in paragraph 63.

64.     The Defendants deny the averments set forth in paragraph 64.

65.     The Defendants deny the averments set forth in paragraph 65.

66.     The Defendants deny the averments set forth in paragraph 66.

67.     Paragraph 67 of the Complaint sets forth a statement to which no response is required.  To the extent a response is required, the Defendants incorporate by reference their responses to paragraphs 1–66 of the Complaint.

68.     With regard to paragraph 68 of the Complaint, the document referenced therein speaks for itself.

69.     With regard to the averments set forth in paragraph 69 of the Complaint, Defendants admit Mr. Reid was a founder of and is the chief executive officer of Encore Gaming and that Mr. Reid was aware a License Agreement for the Instant Racing™ games existed.  The Defendants deny the remaining averments in paragraph 69.

70.     The Defendants deny the averments set forth in paragraph 70.

71.     The Defendants deny the averments set forth in paragraph 71.

72.     The Defendants deny the averments set forth in paragraph 72.

73.     The Defendants deny the averments set forth in paragraph 73.

74.     The Defendants deny the averments set forth in paragraph 74.

75.     Paragraph 75 of the Complaint sets forth a statement to which no response is required.  To the extent a response is required, the Defendants incorporate by reference their

responses to paragraphs 1–74 of the Complaint.

76.    The Defendants deny the averments set forth in paragraph 76.

77.    The Defendants deny the averments set forth in paragraph 77.

78.    The Defendants deny the averments set forth in paragraph 78.

79.    The Defendants deny the averments set forth in paragraph 79.

80.    The Defendants deny the averments set forth in paragraph 80.

81.    The Defendants deny the averments set forth in paragraph 81.

82.    Paragraph 82 of the Complaint sets forth a statement to which no response is required. To the extent a response is required, the Defendants incorporate by reference their responses to paragraphs 1–81 of the Complaint.

83.    The Defendants deny the averments set forth in paragraph 83.

84.    The Defendants deny the averments set forth in paragraph 84.

85.    The Defendants deny the averments set forth in paragraph 85.

86.    Paragraph 86 of the Complaint sets forth a statement to which no response is required. To the extent a response is required, the Defendants incorporate by reference their responses to paragraphs 1–85 of the Complaint.

87.    With regard to paragraph 87 of the Complaint, the document referenced therein speaks for itself.

88.    The Defendants deny the averments set forth in paragraph 88.

89.    The Defendants deny the averments set forth in paragraph 89.

90.    The Defendants deny the averments set forth in paragraph 90.

91.    The Defendants deny the averments set forth in paragraph 91.

92.    The Defendants deny the averments set forth in paragraph 92.

93.    The Defendants deny each and every allegation contained in the Complaint express or implied, which is not expressly and specifically admitted in one of the foregoing paragraphs of this Answer, including without limitation, any implicit allegations contained in the headings or in the "wherefore" paragraph stating Plaintiff's prayer for relief.

### THIRD DEFENSE

Plaintiff's claims are barred in whole or in part by principles of waiver and/or estoppel.

### FOURTH DEFENSE

Plaintiff's claims are barred in whole or in part by the doctrine of unclean hands.

### FIFTH DEFENSE

Plaintiff's claims are barred in whole or in part to the extent that Plaintiff failed to mitigate its damages.

### SIXTH DEFENSE

Plaintiff's claims are barred in whole or in part by the terms of the License Agreement.

### SEVENTH DEFENSE

Plaintiff's claims are barred because Plaintiff has undertaken an impermissible and unlawful attempt to create a monopoly or otherwise violate anti-trust laws.

### EIGHTH DEFENSE

Plaintiff's claims are barred because Plaintiff has undertaken anti-competitive conduct in violation of public policy.

### NINTH DEFENSE

Plaintiff's claims are barred, in whole or in part, by the statute of limitations.

## TENTH DEFENSE

Plaintiff's claims are barred, in whole or in part, for the failure to join a required party under Federal Rule of Civil Procedure 19.

## ELEVENTH DEFENSE

Plaintiff's claims are barred, in whole or in part, to the extent that any allegedly misappropriated information or alleged trade secrets are public knowledge, for example via common industry usage, or have otherwise been made available to the public.

## TWELFTH DEFENSE

Plaintiff's claims are barred in whole or in part because the Plaintiff is not the real party in interest.

## COUNTERCLAIMS

For their counterclaims against RaceTech KY, LLC ("RaceTech KY" or "Counterclaim Defendant"), Kentucky Downs, LLC ("Kentucky Downs") and Encore Gaming, LLC ("Encore" and together with Kentucky Downs, "Counterclaim Plaintiffs"), by counsel, respectfully allege and aver as follows:

## NATURE OF THE CASE

1.      This is an action brought pursuant to the antitrust laws of the United States and the laws of the Commonwealth of Kentucky to restrain anticompetitive conduct by Counterclaim Defendant RaceTech KY and to remedy the damage suffered by Counterclaim Plaintiffs Kentucky Downs and Encore as a result of the unlawful efforts of RaceTech KY and non-party AmTote International, Inc. ("AmTote"), a company offering totalizator[1] services in Kentucky for

---

[1]      Kentucky's regulations use this spelling of "totalizator." *See, e.g.*, 810 KAR 1:011 § 2.  In its agreements and Complaint, AmTote uses the spelling "totalisator."  Unless quoting AmTote, the Defendants will use the regulatory version of the spelling.

live wagering, simulcast wagering, and wagering on historical horse races, to maintain and expand their Instant Racing™ monopoly and to eliminate the threat posed by Encore, their sole competitor.

2.      Among other concerted actions, RaceTech KY and others conspired in an attempt to cut off Encore's access to the historical racing database.

3.      Kentucky Downs, a licensed horse racing association in Kentucky, opened in 1990 and hosts one live turf racing meeting each September.  In addition to live horse racing, Kentucky Downs hosts year-round simulcasting of races at other race tracks.  Beginning in 2011, Kentucky Downs also began offering wagering on historical horse races.  From that time until Spring 2015, the only available option for customers making pari-mutuel wagers on historical horse races were the terminals provided by RaceTech, LLC or RaceTech KY, or both of them, known as Instant Racing™.

4.      Kentucky Downs provided Instant Racing™ pursuant to a License Agreement with RaceTech KY.  In or about August 2014, the License Agreement expired by its own terms.  The agreement was extended, on a month-to-month basis, until December 2014.  Then, in early 2015, RaceTech KY advised Kentucky Downs that it would no longer agree to a month-to-month extension and began proposing alternate terms.  In or about February 2015, RaceTech KY notified Kentucky Downs that, unless Kentucky Downs agreed to accept one of three, non-negotiable options, it would terminate the License Agreement and take back its equipment.  After consideration, Kentucky Downs determined that none of RaceTech KY's options were acceptable, primarily for two key reasons: (i) RaceTech KY demanded exclusivity from Kentucky Downs, such that if Kentucky Downs entered into the agreement, only RaceTech terminals could be on the floor and (ii) RaceTech KY required Kentucky Downs to purchase or

lease the Instant Racing™ machines up front, and RaceTech KY offered no warranty and no return of money in the event the terminals were later invalidated under Kentucky or federal law.

5.     In Kentucky, pari-mutuel wagering on historical horse races "shall only be conducted through the use of a totalizator or other similar mechanical equipment approved by the commission pursuant to KRS 230.361." 810 KAR 1:011 § 2(1).

6.     During that time, AmTote was the only company providing the totalizator or other similar mechanical equipment for Instant Racing™.

7.     Through innovation, Encore developed its own technologically-superior system for pari-mutuel wagering on historical horse races, which system offers enhanced content and a greater variety of games. After RaceTech KY terminated its contract with Kentucky Downs on or about March 31, 2015, Kentucky Downs began offering wagering on historical horse racing through Encore on April 2, 2015. (Letter from Jeremy A. Rockman to Corey Johnsen (March 26, 2015), attached as *Exhibit F* (providing notice that AmTote would appear onsite at Kentucky Downs to remove all Instant Racing™ equipment).) Since the conversion, thousands of consumers have enjoyed use of Encore's systems in the Commonwealth of Kentucky at Kentucky Downs.

8.     RaceTech KY and non-party AmTote, which had already monopolized the market for pari-mutuel wagering on historical horse races, saw Encore's success and the popularity of its innovative system as a threat. RaceTech KY and AmTote realized that the technologically-superior systems provided by Encore and already popular with patrons at Kentucky Downs would present new competition in the market. RaceTech KY and AmTote also perceived Encore's technology as a threat to their Instant Racing™ monopoly, providing an alternate choice for gaming customers. RaceTech KY and AmTote used their dominant market and

monopoly power to attempt to eliminate the threat posed by market entrant, Encore, and Kentucky Downs.

9.      On June 29, 2015, RaceTech KY brought its Complaint, filed herein, immediately following RaceTech KY's termination of their contract and Kentucky Downs' subsequent decision, upon approval of the Kentucky Horse Racing Commission ("KHRC"), to change its provider of historical horse racing systems and technology from RaceTech KY to Encore.  In its Complaint, RaceTech KY seeks to enjoin Kentucky Downs from operating any gaming terminals that use Encore's systems and technology for pari-mutuel wagering on historical horse races and to recover alleged damages.

10.      For purposes of this Counterclaim only, and without admitting any of the allegations therein, Counterclaim Plaintiffs incorporate by reference the allegations of the Complaint, their Answer, and each and every affirmative defense asserted in response to the Complaint.

11.      The purpose of this Counterclaim is to terminate a contract, combination, and conspiracy to orchestrate a joint boycott carried out by RaceTech KY and AmTote, individually and in combination and collusion with each other and others, as described below, to illegally deny Encore access to the historical horse racing database and/or boycott use of Encore's system in an attempt to shut out competition and protect their Instant Racing™ monopoly in the relevant markets.

12.      As a result, Counterclaim Plaintiffs now seek to recover damages for the anti-competitive conduct and antitrust violations of RaceTech KY pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15, and Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1

and 2.  In addition to their antitrust claims, Counterclaim Plaintiffs also seek damages, under Kentucky law, for violation of unfair trade practices, tortious interference, and civil conspiracy.

## THE PARTIES

13.     Kentucky Downs is a Kentucky limited liability company with a principal place of business in Franklin, Kentucky.

14.     Encore is an Indiana limited liability company with citizenship in Kentucky. Encore maintains its principal place of business in Boca Raton, Florida.

15.     Upon information and belief, RaceTech KY is a Kentucky limited liability company with a principal place of business in St. Louis, Missouri.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337(a) because the action arises under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and is brought pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15.

17.     Venue lies in this District pursuant to 28 U.S.C. § 1391(b) and (c).

18.     RaceTech KY is subject to personal jurisdiction as a Kentucky limited liability company and is further subject to personal jurisdiction under Fed. R. Civ. P. 4(k)(1)(C) and the nationwide service of process provision of the Clayton Act, 15 U.S.C. § 22.

## FACTUAL BACKGROUND

A.     **Wagering on Historical Horse Racing**

19.     As is evident by its name, a "historical" horse race is different from both live and simulcast horse racing—both of which involve the real time running of a horse race.  Instead, a historical horse race is

any horse race that:

4847-8402-7430                                                                17

> (a) Was previously run at a licensed pari-mutuel facility located in the United States;
>
> (b) Concluded with official results; and
>
> (c) Concluded without scratches, disqualifications, or dead-heat finishes.

810 KAR 1:001 § 1(30).

20.     "Instant Racing" is not another term for "historical horse racing," and the terms are not interchangeable.  Instead, "Instant Racing™" is a trademark registered by RaceTech, LLC since January 15, 2002 with the United States Patent and Trademark Office applicable to its versions of gaming terminals allowing wagers on historical horse racing.

21.     Instant Racing™ is a method by which an exotic wager on a historical horse race is accepted.

22.     A wager on an historical horse race is an exotic wager, akin to among others, an exacta, trifecta, superfecta, "daily double," or a "pick 3."

**B.     Wagering on Historical Horse Racing at Kentucky Downs**

23.     On August 19, 2011, Kentucky Downs entered into an Equipment and License Agreement with RaceTech KY (the "RaceTech Agreement," attached as *Exhibit A*).

24.     In the RaceTech Agreement, RaceTech KY, as Licensor, provided to Kentucky Downs the equipment necessary to conduct wagering on historical horse races, which included the terminals used by the bettors, a server, and a license to use the technology—what RaceTech KY calls the "Instant Racing System."  (Ex. A, RaceTech Agreement, §§ 2–3.)

25.     In addition, RaceTech KY agreed to provide

> an AmTote International, Inc. ("AmTote") totalisator or similar AmTote system capable of accepting and totalizing all wager amount and types offered the Instant Racing System, and performing all mutuel pool and payment calculations.

(Ex. A, RaceTech Agreement, § 6.2.)

26.     Kentucky Downs began offering wagers on historical horse racing through RaceTech KY's Instant Racing™ terminals to the public in September 2011.

27.     Pursuant to the RaceTech Agreement, the totalizator or other mechanical equipment for Instant Racing™ was provided by AmTote.  (Ex. A, RaceTech Agreement, § 6.2.)

**C.      RaceTech KY Terminates Its Agreement with Kentucky Downs.**

28.     In 2011, 2012, 2013, 2014, and the first three months of 2015, Kentucky Downs continued to offer Instant Racing™ terminals pursuant to the RaceTech Agreement.

29.     During that time, on August 14, 2013, RaceTech KY and Kentucky Downs executed Addendum A to the RaceTech Agreement.  (Addendum A to the Equipment and License Agreement of August 19, 2011, attached as *Exhibit B*.)

30.     On August 1, 2014, by letter agreement, RaceTech KY and Kentucky Downs further amended the monthly fees payable under the RaceTech Agreement.  (Letter from Louis A. Cella to Corey Johnsen, *et al*. (Aug. 1, 2014), attached as *Exhibit C*.)

31.     On December 24, 2014, RaceTech KY and Kentucky Downs amended the RaceTech Agreement.  (First Amendment to Equipment and License Agreement, attached as *Exhibit D*, this document is dated December 24, 2013, but references various documents executed in 2014, therefore it appears that the year 2013 is a typographical error).  Pursuant to that Amendment, among other things, the parties (i) extended the term of the original agreement on a month-to-month basis and allowed either party to terminate the agreement upon 30 days written notice and (ii) agreed to a new schedule of fees and charges.  (*Id*. ¶¶ 4–6 & Schedule C.)

32.     On February 19, 2015, RaceTech KY notified Kentucky Downs that RaceTech KY was terminating the RaceTech Agreement effective March 31, 2015.  (Letter from Louis A.

Cella to Corey Johnsen (Feb. 19, 2015), attached as *Exhibit E* ("The letter shall serve as written notice pursuant to Section 5.3(g) of the License Agreement (such Section 5.3(g) added by the First Amendment) that RaceTech KY is hereby terminating the License Agreement effective as of March 31, 2015 (the 'Termination Date').")

**D.**     **Encore Develops a System for Providing Wagers Only on Historical Horse Racing.**

33.     Encore is in the business of historical horse racing and developed its own system for wagering on historical horse races.

34.     After two years of work, Encore announced the creation of its historical horse racing system in February 2015.  *See* Encore Racing Based Games Announces Entry Into Historic Horse Racing Market, PR Newswire (Feb. 12, 2015), available at http://www.bizjournals.com/prnewswire/press_releases/2015/02/12/FL30248 (last visited April 29, 2015).

35.     As required by Kentucky law, Kentucky Downs submitted its draft application for approval of the Encore historical horse racing terminals to the KHRC in Spring 2014.

36.     As also required by Kentucky law, Kentucky Downs requested approval from the KHRC to offer wagering on historical horse races on the Encore terminals.

37.     The KHRC approved Kentucky Downs to provide the Encore historical horse racing wagers.

38.     Kentucky Downs began offering wagering on historical horse racing through Encore on April 2, 2015.

**E.**     **Encore's Data License Agreement with Equibase Company, LLC ("Equibase")**

39.     Equibase is a general partnership between The Jockey Club and the Thoroughbred Racing Associations of North America (TRA) and as of 1998 became the sole collector of data

and information of Thoroughbred past performances.  *See* Equibase, About Equibase, History, http://www.equibase.com/about/history.cfm?utm_source=siteindex&utm_medium=cpm&utm_content=history&utm_campaign=equibase%2Bhistory.

40.     By Letter Agreement dated August 29, 2014, Encore entered into a Data License Agreement with Equibase ("Equibase Letter Agreement"), providing for a limited non-transferable, non-exclusive license to use certain data solely for the purpose of Encore's pari-mutuel historic horse racing games.

41.     The Equibase Letter Agreement is currently in effect, and its term runs from August 2014 until December 31, 2016, then automatically renews unless cancelled.

**F.     Kentucky Downs' Representation Agreement with Monarch Content Management, LLC ("Monarch")**

42.     Effective November 23, 2013, Kentucky Downs entered into a Representation Agreement with Monarch.

43.     Monarch is a limited liability company formed primarily for the purpose of purchasing and selling horse racing content on behalf of its member racetracks for wagering purposes.

44.     Monarch acts as a simulcast purchase and sales agent for numerous North American racetracks and wagering outlets.

45.     AmTote and Monarch are both part of the Stronach Group, founded by Frank Stronach and headquartered in Canada.  *See*  http://www.stronachgroup.com/team; http://www.stronachgroup.com/mediatech.

**G.     RaceTech KY Conspires with Others to Interfere with Counterclaim Plaintiffs' Historical Horse Racing Business in an Attempt to Maintain Their Monopoly**

46.     Upon information and belief, immediately after RaceTech deactivated the Instant Racing™ System terminals at Kentucky Downs and Kentucky Downs offered wagers on

historical horse races through terminals provided by Encore, RaceTech KY contacted several other associations or companies transacting business with Encore and/or Kentucky Downs to interfere with existing business contracts and relationships and to keep Counterclaim Plaintiffs out of the relevant markets.

47.     Upon information and belief, in or about March 2015, RaceTech KY contacted Monarch in an attempt to convince Monarch, on behalf of its member racetracks, not to provide horse racing content and track data to the Counterclaim Plaintiffs.

48.     Shortly thereafter, Monarch sent correspondence to Encore, by letter dated April 8, 2015, asserting claims on behalf of fourteen tracks (at least four of which are part of the Stronach Group) that the use of their races on the Encore terminals in some unspecified nature was not authorized.  (Letter from Scott J. Daruty to Corey Johnsen (April 8, 2015), attached as *Exhibit J*.)

49.     On or about April 10, 2015, counsel for Encore responded to Monarch's letter, specifically requesting Monarch to identify "any authority or any specific claim of right under the laws of the Commonwealth of Kentucky or the laws of the United States of America" concerning the purported rights they claimed to have been violated.  (Letter from David Allen Barnette to Scott J. Daruty (April 10, 2015), attached as *Exhibit G*.)

50.     Despite Encore's repeated efforts to discern any specific intellectual property claim Monarch was asserting on behalf of the racetracks, Encore never received a response from Monarch.

51.     Monarch also ignored Encore's willingness to resolve or correct any legitimate intellectual property claim, and to date, Monarch has not presented any legal basis for making the alleged intellectual property claims.

52.     Upon information and belief, at the same time that Encore was attempting, in good faith, to address the alleged intellectual property concerns with Monarch, the Counterclaim Defendant and others, including Monarch, were using the frivolous intellectual property claim (without ever identifying the legal basis for that purported claim) as a means to organize a concerted group boycott that would deprive Encore of access to the industry database for historical horse racing information.

53.     Upon information and belief, on or about April 14, 2015, RaceTech KY and/or RaceTech, LLC contacted counsel for the Kentucky Horsemen's Benevolent and Protective Association ("HBPA") and represented that it was somehow improper for Encore to use track data including the names of horses and jockeys without paying compensation to the horsemen. (Memorandum from Peter Ecabert to Rich Hiles & Marty Maline (April 14, 2015), attached as *Exhibit K*.)

54.     RaceTech's statements to the HBPA were not correct:  prior to placing a wager, the Encore system does not use the names of any horses or jockeys, thus that information is not used as a means to promote the games; only after a wager is completed, the bettor may view the names of the horses and jockeys in the race on which he or she placed a wager; and Encore pays Equibase for this data, including the names of the horses and jockeys.

55.     Upon information and belief, in or about April 2015, RaceTech KY contacted Equibase in an attempt to convince Equibase to deny Encore access to its historical racing database.  (*See* Ex. K.)

56.     Shortly thereafter, the concerted anticompetitive efforts of RaceTech, Monarch, and others came to fruition.  On April 16, 2015, Equibase sent correspondence to Encore, citing Section 14(c) of the Equibase Letter Agreement, based on an unidentified intellectual property

concern, and indicating that Encore must obtain advance permission from two tracks (at least one of which is owned by a person or persons related to RaceTech, LLC) before including races which occurred at either of those tracks.  (Letter from Marc Summers to Tom Aronson (April 16, 2015), attached as *Exhibit H*.)

57.     By letter dated May 18, 2015, Equibase advised Encore that it "has been notified" by the owners/operators of fifteen (15) identified racetracks that Encore has not received authorization from them to display video replays of races conducted at their respective racetracks.  (Letter from Marc Summers to Tom Aronson (May 18, 2015), attached as *Exhibit I*.)

58.     Subsequently, one racetrack notified Equibase that it had never notified Equibase of any objection to the use of their races by Encore and had no objection to the use of their races by Encore.

59.     The Equibase letter dated May 18, 2015, reflects a concerted action to orchestrate a joint boycott carried out by RaceTech KY, individually and in combination and collusion with other companies in the thoroughbred industry, to illegally deprive Encore access to the historical horse racing database and/or to illegally boycott use of Encore's system in an attempt to shut out competition and protect their Instant Racing™ monopoly.  Because there is no pro-competitive or other lawful justification for their concerted anticompetitive acts, the alleged conduct is a *per se* violation of federal antitrust law.

60.     Upon information and belief, in or about June 2015, RaceTech KY or its designees contacted Axcis Information Network, Inc. ("Axcis"), a California corporation, in an attempt to convince Axcis not to conduct business with Encore.

61.     In all three instances, the purpose of the conspiracy is to unlawfully maintain RaceTech KY's monopoly power in the market of wagering on historical horse racing and

attempt to monopolize the market through the services provided by AmTote and by depriving Encore access to the historical horse racing database, and thereby, shut out competition from Encore.

62.     The anticompetitive actions of RaceTech KY and others have unlawfully injured competition in the market for historical horse racing wagering and adversely affected business activities in interstate commerce.    No pro-competitive reasons exist that justify the anticompetitive actions of RaceTech, and thus, the alleged concerted action is a *per se* violation of the Sherman Act.

63.     RaceTech KY's anticompetitive actions and group boycott intentionally have had, or are continuing to have, the following adverse effects, among others, on the relevant markets:

(a)     Attempting to drive Encore out of business in the relevant market, and thereby, eliminate competition within the relevant markets;

(b)     Attempting to reduce the supply of gaming services and the supply of wagering opportunities in the relevant market for patrons; and

(c)     Attempting to cut off Encore's supply of and access to necessary historical horse racing data from Equibase.

64.     As a direct, foreseeable, and proximate result of RaceTech KY's anticompetitive conduct and unlawful attempt to maintain its monopoly of operating systems for pari-mutuel wagering on historical horse races, Counterclaim Plaintiffs have been deprived the benefits of free and fair competition on the merits and had a reduced ability to negotiate a fair deal with RaceTech KY.

65.     The public interest is also directly affected by the anticompetitive conduct alleged herein.  By virtue of its monopoly power, RaceTech KY has not performed expensive research and development that is necessary to develop innovative new games and titles for its virtually-unchanged Instant Racing™ system.  At Kentucky Downs alone, the public's preference for

Encore's modern system over RaceTech KY's system was dramatic, and after the conversion, Kentucky Downs experienced record-breaking play. The Commonwealth's interest in tax revenue is driven by the play. If the play is depressed, less tax revenue will be generated for the Commonwealth. Furthermore, because the tax funds are ultimately spent on the public welfare, citizens of the Commonwealth will also suffer negative effects of RaceTech KY's anticompetitive conduct if it is allowed to shut out Encore as an entrant in the marketplace.

<u>COUNT I</u>

**VIOLATION OF § 1 OF THE SHERMAN ACT**
**(Restraint of Interstate Commerce)**

66. Counterclaim Plaintiffs reallege and incorporate by reference the allegations in all preceding paragraphs as if fully restated herein.

67. Counterclaim Defendant's actions as alleged herein violate Section 1 of the Sherman Act, which prohibits contracts, combinations, and conspiracies in restraint of trade. *See* 15 U.S.C. § 1.

*Interstate Trade and Commerce*

68. The activities of RaceTech KY, as described in this Counterclaim, were and are within the flow of interstate commerce and have substantially adversely affected interstate commerce.

*The Relevant Market*

69. The relevant product market is the use of the historical horse racing database and/or use of technology for pari-mutuel wagering on historical horse races.

70. The relevant geographic market is the Commonwealth of Kentucky and other areas within reasonable geographic proximity of travel.

*The Conspiracy*

71.     Upon information and belief, in or around Spring 2015, shortly after Encore announced its own system and technology for pari-mutuel wagering on historical horse races, RaceTech KY, along with others, agreed and conspired to form a group boycott that would deprive Encore of horse racing content from at least fourteen thoroughbred racetracks and deny Encore's access to Equibase's historical horse racing database, in violation of Section 1 of the Sherman Act.

72.     Upon information and belief, in or around Spring 2015, shortly after Encore announced its own system and technology for pari-mutuel wagering on historical horse races, RaceTech KY conspired with others to deprive Encore of access to racing data in violation of Section 1 of the Sherman Act.

73.     RaceTech KY conspired with others to effectuate a group boycott (purportedly based on an unidentified and meritless intellectual property claim), against Encore with specific intent to: (i) attempt to drive Encore out of business; (ii) attempt to eliminate the only other competitor to their Instant Racing™ systems in the relevant geographic market; and (iii) use their dominant position and monopoly power to attempt to monopolize the market for pari-mutuel wagering on historical horse races in the relevant geographic market.

74.     RaceTech KY knew that its concerted activity would significantly diminish Encore and Kentucky Downs' capacity to operate and generate revenue, and otherwise cause harm, including but not limited to, injuring Encore and Kentucky Downs' business, reputation, and goodwill.

75.     RaceTech KY did not have the right to interfere with Encore and Kentucky Down's access to racetrack data and/or interfere with their business relationships at the time or in the manner that they did.

*Injury and Damages*

76.     RaceTech KY's group boycott of Encore and Kentucky Downs was injurious to competition in ways that antitrust laws were intended to prevent.  As a direct and proximate result of RaceTech KY's actions, and if their aims are successful, pari-mutuel wagering patrons will have fewer opportunities to bet on historical horse races within the Commonwealth of Kentucky and will lose access to the superior technological platform offered by Encore's systems.

77.     The anticompetitive actions of RaceTech have caused, and will continue to cause, unlawful injury to competition in the market for historical horse racing wagering and will adversely affect business activities in interstate commerce.  No pro-competitive reasons exist that justify the anticompetitive actions of RaceTech KY.  As a result, the alleged concerted actions constitute a per se antitrust violation of the Sherman Act.

78.     RaceTech KY's anticompetitive actions and group boycott intentionally have had, or are continuing to have, the following adverse effects, among others, on the relevant markets:

(a)     Attempting to drive Encore out of business in the relevant market, and thereby, eliminate competition within the relevant markets;

(b)     Attempting to reduce the supply of gaming services for patrons and the supply of wagering opportunities in the relevant market; and

(c)     Attempting to cut off Encore's supply of and access to necessary historical horse racing data from Equibase.

79.     As a direct and proximate result of RaceTech KY's anticompetitive conduct, Encore and Kentucky Downs' business and company goodwill have been and will continue to be damaged.

80.     RaceTech KY's anticompetitive actions and effects were specifically intended to harm Encore and Kentucky Downs.

4847-8402-7430                                     28

81.     The anticompetitive actions of RaceTech KY, in conjunction with others, as alleged above, have proximately caused injury to Kentucky Downs and Encore by inhibiting them from effectively competing in the relevant markets and by diverting their business and sales.  As a result, Kentucky Downs and Encore have been directly injured in their business and property in an amount to be determined at trial.

82.     Kentucky Downs and Encore are entitled to an award of damages, including an amount up to three times the amount found as actual damages, reasonable attorneys' fees and costs, under Section 4 of the Clayton Act, 15 U.S.C. § 15.

83.     Kentucky Downs and Encore will continue to suffer damages as a result of the unlawful actions of RaceTech KY unless it, its officers, agents, services, employees, attorneys, and those persons acting in concert with them, are permanently enjoined from continuing such anticompetitive actions.

## COUNT II

### VIOLATION OF § 2 OF THE SHERMAN ACT
### (Conspiracy to Monopolize, Attempted Monopolization, and Monopolization)

84.     Counterclaim Plaintiffs reallege and incorporate by reference the allegations in all preceding paragraphs as if fully restated herein.

85.     RaceTech KY's actions as alleged herein violate Section 2 of the Sherman Act, which prohibits attempted monopolization and combinations and conspiracies to monopolize any part of trade or commerce.  See 15 U.S.C. § 2.

86.     At all times relevant, RaceTech KY possessed monopoly power in the relevant market, as alleged above.

87.     Upon information and belief, in or around Spring 2015, shortly after Encore announced its own system and technology for pari-mutuel wagering on historical horse races,

RaceTech KY willfully used its monopoly power by anti-competitive or exclusionary means (including, but not limited to, their agreement and conspiracy to form a group boycott) with the specific design to exclude or destroy competition from Encore, its only competitor.

88.     RaceTech KY has illegally attempted to maintain the Instant Racing™ monopoly, and attempted to monopolize and combined and conspired to monopolize with others the market for pari-mutuel wagering on historical horse races in the relevant geographic market.  RaceTech KY engaged in a planned and executed strategy to deprive Encore of necessary racing data from the Equibase historical horse racing database and to deny Encore track data from at least fourteen thoroughbred racetracks with the specific intent to: (i) attempt to drive Encore out of business; (ii) attempt to eliminate the only other competitor to their Instant Racing™ systems in the relevant geographic market; and (iii) use their dominant position and monopoly power to attempt to monopolize the market for pari-mutuel wagering on historical horse races in the relevant geographic market.

89.     Given its existing dominance and monopoly power in the market, RaceTech KY's attempt to perpetuate its monopoly and exclude Encore has a dangerous probability of success absent court intervention.

90.     Encore and Kentucky Downs have been damaged by the unlawful and anticompetitive actions of RaceTech KY and its co-conspirators, both financially and in their reputations, good will, and industry presence.

91.     As a direct and proximate result of RaceTech KY's actions, Encore and Kentucky Downs's business and company goodwill have been and will continue to be damaged by the anticompetitive effects of RaceTech KY's conduct.

92.     RaceTech KY's anticompetitive actions and effects were specifically intended to

harm Encore and Kentucky Downs by destroying competition and building and protecting their monopoly.

## COUNT III

### VIOLATION OF KENTUCKY REV. STAT. 367.175(1)
### (Kentucky Consumer Protection Act)

93.     Counterclaim Plaintiffs reallege and incorporate by reference the allegations in all preceding paragraphs as if fully restated herein.

94.     By conspiring to engage in the above alleged anticompetitive conduct, including concerted group boycott, RaceTech KY contracted, combined, or conspired in restraint of trade or commerce in this Commonwealth, in violation of Ky. Rev. Stat. 367.175(1).

95.     RaceTech KY's anti-competitive actions, as alleged above, have injured competition and adversely affected commerce within Kentucky and business activities in Kentucky commerce.  No pro-competitive reasons exist that justify the anticompetitive actions of RaceTech KY.

96.     The anticompetitive actions of RaceTech KY, as alleged above, have proximately caused injury to Kentucky Downs and Encore by inhibiting them from effectively competing in the relevant markets and by diverting their business.  As a result, Kentucky Downs and Encore have been directly injured in their business and property in an amount to be established at trial.

## COUNT IV

### VIOLATION OF KENTUCKY REV. STAT. 367.175(2)
### (Kentucky Consumer Protection Act)

97.     Counterclaim Plaintiffs reallege and incorporate by reference the allegations in all preceding paragraphs as if fully restated herein.

98.     By conspiring to engage in the above alleged anticompetitive conduct, including

concerted group boycott, RaceTech KY monopolized, attempted to monopolize, or combined or conspired with any other person or persons to monopolize or attempt to monopolize a part of the trade or commerce in this Commonwealth, in violation of Ky. Rev. Stat. 367.175(2).

99.     At all times relevant, RaceTech KY possessed monopoly power in the relevant market, as alleged above.

100.    Upon information and belief, in or around Spring 2015, shortly after Encore announced its own system and technology for pari-mutuel wagering on historical horse races, RaceTech KY willfully used its monopoly power by anti-competitive or exclusionary means (including, but not limited to, their agreement and conspiracy to form a group boycott) with the specific design to exclude or destroy competition from Encore, its only competitor.

101.    RaceTech KY has illegally attempted to maintain the Instant Racing™ monopoly within the Commonwealth, and attempted to monopolize and combined and conspired to monopolize with others the market for pari-mutuel wagering on historical horse races in the relevant geographic market.  RaceTech KY engaged in a planned and executed strategy to deprive Encore of necessary racing data from the Equibase historical horse racing database and to deny Encore track data from at least fourteen thoroughbred racetracks with the specific intent to: (i) attempt to drive Encore out of business; (ii) attempt to eliminate the only other competitor (worldwide) to the Instant Racing™ systems in the relevant geographic market; and (iii) use its dominant position and monopoly power to attempt to monopolize the market for pari-mutuel wagering on historical horse races in the relevant geographic market.

102.    Given its existing dominance and monopoly power in the market, RaceTech KY's attempt to perpetuate its monopoly and exclude Encore has a dangerous probability of success absent court intervention.

103.     Encore and Kentucky Downs have been damaged by the unlawful and anticompetitive actions of RaceTech KY and its co-conspirators, both financially and in their reputations, good will, and industry presence.

104.     As a direct and proximate result of RaceTech KY's actions, Encore and Kentucky Downs' business and company goodwill have been and will continue to be damaged by the anticompetitive effects of RaceTech KY's conduct.

105.     RaceTech KY's anticompetitive actions and effects were specifically intended to harm Encore and Kentucky Downs by destroying competition and building and protecting their monopoly.

## COUNT V

## TORTIOUS INTERFERENCE WITH CONTRACT

106.     Counterclaim Plaintiffs reallege and incorporate by reference the allegations in all preceding paragraphs as if fully restated herein.

107.     At all times relevant, Encore had a valid business relationship or expectancy with Equibase.

108.     At all times relevant, RaceTech KY was aware of the relationship or expectancy between Encore and Equibase.

109.     RaceTech KY, through its anticompetitive activity and concerted group boycott, as alleged above, intentionally interfered with Encore's relationship with Equibase in that it has attempted to convince Equibase to cease providing historical horse racing data to Encore.

110.     RaceTech KY's improper conduct was not justified and was for illegal, anticompetitive purposes, as alleged above, in an attempt to maintain its own monopoly power and to exclude or destroy competition.

111.   As a direct and proximate result, Encore has been damaged by RaceTech KY's tortious interference of Encore's prospective business relationship with Equibase, causing damage in an amount to be determined at trial.

## COUNT VI

## CIVIL CONSPIRACY

112.   Counterclaim Plaintiffs reallege and incorporate by reference the allegations in all preceding paragraphs as if fully restated herein.

113.   RaceTech KY conspired with others, as alleged above, to commit unlawful acts, or to do lawful acts in an unlawful way.

114.   In furtherance of the illegal conspiracy, RaceTech KY committed an overt act in furtherance of the aims of the conspiracy.

115.   Kentucky Downs and Encore have suffered actual injury as a proximate result of the overt acts committed by RaceTech KY in furtherance of its conspiracy with others.

116.   Kentucky Downs and Encore are entitled to recover damages necessary to counteract the effects of RaceTech KY's illegal civil conspiracy.

## PRAYER FOR RELIEF

WHEREFORE, Kentucky Downs and Encore request a trial by jury on all issues so triable and pray for relief and judgment against RaceTech KY as follows:

1.   The Defendants demand judgment in their favor and against Plaintiff on all causes of action, including dismissal of Plaintiff's Complaint, that Plaintiff take nothing by way of its Complaint;

2.   For compensatory damages in an amount to be proven at trial on all of the Defendants' Kentucky law and federal law counterclaims;

3.   For an order trebling the amount of compensatory damages to be awarded to Defendants on their counterclaims pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15;

4.      For an award of the costs of this action, including its reasonable attorneys' fees;

5.      For an award of pre-judgment and post-judgment interest on all damages awarded to Defendants, to the extent permitted by law;

6.      For such other permanent relief as is necessary and appropriate to restore fair competitive conditions in the market affected by RaceTech KY's unlawful conduct; and

7.      For such additional relief as the Court may find just and proper.

Dated:  August 13, 2015                    Respectfully submitted,

                                           /s/  Mary Elisabeth Naumann
                                           William A. Hoskins (KY Bar # 33350)
                                           Mary Elisabeth Naumann (KY Bar # 88328)
                                           JACKSON KELLY PLLC
                                           175 East Main Street, Ste. 500
                                           Lexington, KY 40507
                                           Telephone:  (859) 255-9500
                                           Fax:  (859) 252-0688
                                           E-mail: whoskins@jacksonkelly.com
                                                    mnaumann@jacksonkelly.com

                                           David Allen Barnette
                                           (*pro hac vice* admission to be applied for)
                                           JACKSON KELLY PLLC
                                           500 Lee St. E, Suite 1600
                                           Charleston, WV  25301
                                           Telephone:  (304) 340-1327
                                           Fax: (304) 340-1380
                                           E-mail: dbarnette@jacksonkelly.com

                                           *Counsel for Kentucky Downs, LLC and Encore
                                           Gaming, LLC*

## CERTIFICATE OF SERVICE

On August 13, 2015, I served the foregoing document through the ECF system, which will send a notice of electronic filing to the following:

E. Kenly Ames
kames@elpolaw.com,
jmckinney@elpolaw.com

and I mailed this document and the notice of electronic filing to:

Daniel Sakaguchi
Armstrong Teasdale, LLP
7700 Forsyth Blvd., Suite 1800
St. Louis, MO 63105

Kevin D. Evans
Armstrong Teasdale, LLP
4643 S Ulster St., Suite 800
Denver, CO 80237

Zachary C. Howenstine
Armstrong Teasdale, LLP
7700 Forsyth Blvd., Suite 1800
St. Louis, MO 63105

/s/ Mary Elisabeth Naumann
JACKSON KELLY PLLC
175 East Main Street, Ste. 500
Lexington, KY  40507
Telephone: (859) 255-9500
E-mail:  mnaumann@jacksonkelly.com
*Counsel for Defendants*

4847-8402-7430