UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
BOWLING GREEN DIVISION
CIVIL ACTION NO. 1:15-CV-00082-GNS

RACETECH, LLC                                                                                          PLAINTIFF

v.

KENTUCKY DOWNS, LLC
ENCORE GAMING, LLC                                                                              DEFENDANTS

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on Plaintiff's Motion to Dismiss Amended Counterclaims (DN 22) and Plaintiff's Motion for Leave to File Overlength Reply (DN 33). The motions have been fully briefed and are ripe for decision. For the reasons stated below, the motions are **GRANTED**.

I.      BACKGROUND

This motion to dismiss relates to counterclaims by Defendants Kentucky Downs, LLC ("Kentucky Downs") and Encore Gaming, LLC ("Encore") alleging violations of federal and Kentucky antitrust laws, interference with a business relationship, and civil conspiracy against RaceTech. (Answer & Am. Countercl. ¶¶ 66-116, DN 17). Plaintiff RaceTech, LLC ("RaceTech") is a company that provides a pari-mutuel gaming system called INSTANT RACING™ based on historical horse racing, which is a means of pari-mutuel wagering through computer terminals utilizing data from past horse races.[1] (Compl. ¶ 2, DN 1; Defs.' Resp. to

---

[1] The sole provider of this data in the thoroughbred horse racing industry is Equibase Company, LLC ("Equibase"). (Answer & Am. Countercl. ¶ 39). Encore entered into a data licensing agreement with Equibase on August 29, 2014, which runs through December 31, 2016. (Defs.' Resp. 9).

Mot. to Dismiss 3-4, DN 25 [hereinafter Defs.' Resp.]). The INSTANT RACING platform employs a totalizator service[2] which is provided by AmTote International, Inc. ("AmTote").[3] Combined, the platform allows players to place wagers on past races via computer monitors with winnings paid out of a wager pool, rather than by the racetrack.

On August 19, 2011, RaceTech entered into a licensing agreement with Kentucky Downs to provide INSTANT RACING terminals at Kentucky Downs' racetrack located in Franklin, Kentucky. (Defs.' Resp. 7). The parties amended the agreement multiple times, including a provision allowing either party to terminate the license on thirty days' notice. (Defs.' Resp. 7). On February 19, 2015, RaceTech notified Kentucky Downs that it was terminating the agreement effective March 31, 2015, though RaceTech offered to continue service to Kentucky Downs on the condition that RaceTech would be its exclusive provider of historical wagering. (Defs.' Resp. 8). After Kentucky Downs refused these terms and the agreement expired, Kentucky Downs began offering wagering on historical racing through a rival system provided by Encore.

The alleged conspiracy began in March 2015, contemporaneous with the expiration of the RaceTech-Kentucky Downs license. (Answer & Am. Countercl. ¶ 46). According to Kentucky Downs, RaceTech induced Monarch to send a letter to Kentucky Downs claiming that Encore's

---

[2] The term "totalizator" (also spelled "totalisator"), which is synonymous with the term "pari-mutuel," is defined as "a machine for registering the bets and computing the payoff in pari-mutuel betting." *Totalizator*, MERRIAM-WEBSTER, http://www.merriam-webster.com/dictionary/totalizator (last visited Feb. 8, 2016); *Pari-mutuel*, MERRIAM-WEBSTER, http://www.merriam-webster.com/dictionary/pari-mutuel (last visited Feb. 8, 2016).

[3] AmTote is part of the Stronach Group, which owns several racetracks and is engaged in the business of operating and supplying pari-mutuel technology. (Def.'s Resp. 5). Another company in the group is Monarch Content Management, LLC ("Monarch"), which has no direct involvement with historical racing, but does buy and sell rights relating to horse races run across North America. (Defs.' Resp. 5). Therefore, AmTote, Monarch, and the interests of several race tracks are alleged to fall within the Stronach Group umbrella. (Def.'s Resp. 6).

2

terminals were improperly using racing content from fourteen racetracks, four of which are part of the Stronach Group. (Answer & Am. Countercl. ¶¶ 47-48; Defs.' Resp. 10). RaceTech also is alleged to have contacted the Kentucky Horsemen's Benevolent and Protective Association ("HBPA") to inform the HBPA that Encore's system improperly used data without compensating jockeys. (Answer & Am. Countercl. ¶ 53). Defendants further claim that an officer of RaceTech communicated with Equibase, raising intellectual property concerns related to Encore's gaming system. (Answer & Am. Countercl. ¶ 55). Equibase then sent a letter to Encore, asserting that Encore was required to obtain advance permission from two racetracks before using data from races conducted at those tracks. (Answer & Am. Countercl. ¶ 56; Answer & Am. Countercl. Ex. H, at 1-2, DN 17-2). Finally, RaceTech representatives allegedly contacted a subsidiary of Equibase, Axcis Information Network, Inc. ("Axcis"), raising similar concerns. (Answer & Am. Countercl. ¶ 60). Combined, Defendants allege that a corporate conspiracy exists from the foregoing communications and actions intending to harm Defendants' historical racing operations.

## II. JURISDICTION

The Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. §§ 1331 and 1338(a) because it arises under the laws of the United States. This Court has supplemental jurisdiction over all other claims pursuant to 28 U.S.C. § 1367(a).

## III. STANDARD OF REVIEW

Plaintiff has moved to dismiss Defendants' counterclaims. In order to survive dismissal for failure to state a claim under Rule 12(b)(6), the counterclaims "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted) (citation omitted). "A claim has

facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citation omitted). "[A] district court must (1) view the complaint in the light most favorable to the plaintiff and (2) take all well-pleaded factual allegations as true." *Tackett v. M & G Polymers, USA, LLC*, 561 F.3d 478, 488 (6th Cir. 2009) (citation omitted). "But the district court need not accept a bare assertion of legal conclusions." *Id.* (internal quotation marks omitted) (citation omitted). "A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders naked assertion[s] devoid of further factual enhancement." *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted) (citation omitted).

## IV. DISCUSSION

Defendants' counterclaims arise from RaceTech's supposed communications to third parties. Defendants first allege RaceTech violated Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1-7. (Answer & Am. Countercl. ¶¶ 66-92). Defendants claim a similar violation under state law, KRS 367.175(1)-(2). (Answer & Am. Countercl. ¶¶ 93-105). Finally, Defendants assert common law claims of tortious interference with a prospective business relationship and civil conspiracy. (Answer & Am. Countercl. ¶¶ 106-116). The Court considers each claim in turn.

### A. Sherman Antitrust Act Claims

Defendants allege antitrust claims under Sections 1 and 2 of the Sherman Antitrust Act. (Answer & Am. Countercl. ¶¶ 66-92). Section 1 outlines the specific types of practices that constitute anticompetitive conduct and provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States,

4

or with foreign nations, is declared to be illegal." 15 U.S.C. § 1. Section 2 makes it illegal to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations . . . ." 15 U.S.C. § 2.

### 1. *Section 1 Claim*

To state a cause of action under Section 1 of the Sherman Antitrust Act, Defendants must allege three elements: "(1) the existence of a contract, combination, or conspiracy (2) affecting interstate commerce (3) that imposes an unreasonable restraint on trade." *Churchill Downs Inc. v. Thoroughbred Horsemen's Grp., LLC*, 605 F. Supp. 2d 870, 887 (W.D. Ky. 2009) (citations omitted). While the Section 1 does not provide a private cause of action, 15 U.S.C. § 15 creates such an action for "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws . . . ." 15 U.S.C. § 15(a). Standing to assert a claim requires:

> [An] antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation. It should, in short, be the type of loss that the claimed violations . . . would be likely to cause.

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977) (internal quotation marks omitted) (citation omitted). *See also Chrysler Corp. v. Fedders Corp.*, 643 F.2d 1229, 1235 (6th Cir. 1981) (applying *Brunswick Corp.*). Thus, Defendants must allege an actual injury to establish a Section 1 claim.

While Defendants assert that RaceTech's communications have jeopardized Encore's supply of historical racing data, their counterclaim does not allege an actual injury. (Answer & Am. Countercl. ¶¶ 76-83). Defendants instead claim only a potential injury to their business and

what *could* happen "if [RaceTech's] [efforts] are successful . . . ." (Answer & Am. Countercl. ¶¶ 76, 78). Encore's licensing agreement with Equibase is currently in effect until December 31, 2016, and Defendants have not stated that their access to the data from Equibase has actually been adversely affected by RaceTech's actions. (Answer & Am. Countercl. ¶¶ 40-41). As such, Defendants' fail to allege any actions on the part of RaceTech which have ripened into an actual injury as required to state a private cause of action under Section 1.

Equibase's letter dated April 16, 2015, does not constitute an injury sufficient to support the alleged Section 1 violation. In that letter, Equibase directs that Encore comply with the terms of their licensing agreement. (Answer & Am. Countercl. Ex. H, at 1-2). There is no claim, however, that Equibase has ended its relationship with Encore or that Encore's access to historical racing data has *presently* been hindered in any way. Encore cannot claim an injury simply because Equibase requests that Encore comply with its existing contractual obligations. To the contrary, Kentucky Downs—which utilizes Encore's services—has experienced robust business from its historical gaming system, generating over $30 million dollars in revenue in July 2015 alone. (Pl.'s Mot. to Dismiss Ex. A, at 4, DN 22-3). Under these circumstances, Defendants have failed to plausibly state an actual injury to support a claim under Section 1, and this claim is dismissed.[4]

---

[4] RaceTech has outlined numerous other reasons in support of its motion, including the fact that Encore has conceded that it is RaceTech's sole competitor. (Pl.'s Reply to Mot. to Dismiss 9, DN 32). As the Sixth Circuit has noted, "[b]ecause protecting competition is the *sine qua non* of the antitrust laws, a complaint alleging only adverse effects suffered by an individual competitor cannot establish an antitrust injury." *Wee Care Child Ctr., Inc. v. Lumpkin*, 680 F.3d 841, 847-48 (6th Cir. 2012) (internal quotation marks omitted) (quoting *Care Heating & Cooling, Inc. v. Am. Standard, Inc.*, 427 F.3d 1008, 1014-15 (6th Cir. 2005)). Thus, this provides an additional basis to dismiss the Section 1 claim.

### 2. *Section 2 Claim*

While it is well-established that an allegation of injury is required to state a claim under Section 1, the case law is less clear as to whether the actual injury requirement likewise extends to claims under Section 2. Under this section, a monopolization claim must have two elements: "(1) the possession of monopoly power in a relevant market; and (2) the willful acquisition, maintenance, or use of that power by anti-competitive or exclusionary means as opposed to 'growth or development resulting from a superior product, business acumen, or historic accident.'" *Conwood Co. v. U.S. Tobacco Co.*, 290 F.3d 768, 782 (6th Cir. 2002) (citations omitted). "To establish the offense of monopolization a plaintiff must demonstrate that a defendant either unfairly attained or maintained monopoly power." *Potters Med. Ctr. v. City Hosp. Ass'n*, 800 F.2d 568, 574 (6th Cir. 1986) (citing *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966)). *See also Beverage Mgmt., Inc. v. Coca-Cola Bottling Corp.*, 653 F. Supp. 1144, 1151 (S.D. Ohio 1986). "Monopoly power consists of 'the power to control prices or exclude competition.'" *Potters Med. Ctr.*, 800 F.2d at 574 (citing *Grinnell*, 384 U.S. at 571). "An attempted monopolization [under Section 2] occurs when a competitor, with a dangerous probability of success, engages in anti-competitive practices the specific design of which are[] to build a monopoly or exclude or destroy competition." *Smith v. N. Mich. Hosps., Inc.*, 703 F.2d 942, 954 (6th Cir. 1983) (internal quotation marks omitted) (citation omitted).

While Plaintiff maintains that Defendants' Section 2 claim should likewise be dismissed for lack of an actual injury, the Court declines to extend the injury requirement to this claim because such causes of action can conceivably be based on an "attempted monopolization" rather than an injury that has already occurred. *See Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 454 (noting that "§ 2 addresses the actions of single firms that monopolize or attempt to

monopolize . . . ."). Therefore, Defendants' Section 2 claim may be valid even in the absence of an allegation of actual injury.

### 3. Noerr-Pennington *Doctrine*

While Defendants could arguably state a plausible cause of action under Section 2 even in the absence of an injury, this claim may be precluded by the *Noerr-Pennington* Doctrine. *See Opdyke Inv. Co. v. City of Detroit*, 883 F.2d 1265, 1267-68, 1273 (6th Cir. 1989). Under this doctrine, "'genuine attempts to influence passage or enforcement of laws are immune from antitrust scrutiny, regardless of the anticompetitive purpose behind such attempts.' The doctrine is based on a right of petition that extends also to exercise of the right to petition courts for judicial relief." *Id.* at 1273 (internal citation omitted) (citation omitted). Thus, the *Noerr-Pennington* Doctrine prevents liability for conduct aimed at influencing decision-making by the government. *See Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749, 1757 (2014); *E. R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961); *UMWA v. Pennington*, 381 U.S. 657 (1965).

In addition to traditional petitions to the government, the *Noerr-Pennington* Doctrine also applies to good faith litigation including efforts to induce litigation by third parties. *See Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972); *Knology, Inc. v. Insight Commc'ns Co.*, 393 F.3d 656, 659 (6th Cir. 2004); *Opdyke Inv. Co.*, 883 F.2d at 1273 (citing *City of Cleveland v. Cleveland Elec. Illuminating Co.*, 734 F.2d 1157, 1163 (6th Cir. 1984)). To determine whether the doctrine applies, the Court must look at the "source, context, and nature of the anticompetitive restraint at issue." *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 499 (1988). "[T]he claim of *Noerr* immunity cannot be dismissed on the ground that

the conduct at issue involved no direct petitioning of government officials, for *Noerr* itself immunized a form of indirect petitioning." *Id*. at 503 (citation omitted).

To date, none of the parties allegedly contacted by RaceTech have filed suit. Instead, the only product of RaceTech's claimed communications has been correspondence from those parties to Encore. (Answer & Am. Countercl. ¶¶ 53-59). Therefore, the question the Court must answer is whether the *Noerr-Pennington* Doctrine extends to RaceTech's alleged pre-suit communications to third parties that have not resulted in litigation. Other circuits have held that *Noerr-Pennington* immunity is applicable to pre-litigation communications which do not actually culminate with a lawsuit.[5] *See Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 935 (9th Cir. 2006); *Primetime 24 Joint Venture v. Nat'l Broad. Co.*, 219 F.3d 92, 100 (2d Cir. 2000); *Glass Equip. Dev., Inc. v. Besten, Inc.*, 174 F.3d 1337, 1343-44 (Fed. Cir. 1999); *McGuire Oil Co. v. Mapco, Inc.*, 958 F.2d 1552, 1560 (11th Cir. 1992); *CVD, Inc. v. Raytheon Co.*, 769 F.2d 842, 850-51 (1st Cir. 1985); *Coastal States Mktg., Inc. v. Hunt*, 694 F.2d 1358, 1366-67 (5th Cir. 1983). Likewise, a sister court has applied the doctrine to cease-and-desist letters relating to alleged trademark infringement. *See Prakash v. Altadis U.S.A. Inc.*, No. 5:10CV0033, 2012 WL 1109918, at *10 (N.D. Ohio Mar. 30, 2012). On this basis, the Court concludes that there is *Noerr-Pennington* protection from antitrust claims arising from pre-suit communications.

---

[5] The decision in *Select Comfort Corp. v. Sleep Better Store, LLC*, 838 F. Supp. 2d 889 (D. Minn. 2012), notes a circuit split on the applicability of the *Noerr-Pennington* Doctrine based upon the Tenth Circuit's decision in *Cardtoons L.C. v. Major League Baseball Players Ass'n*, 208 F.3d 885 (10th Cir. 2000). *See Select Comfort Corp.*, 838 F. Supp. 2d at 896. This Court disagrees with that characterization of a circuit split because seven circuits—including the Tenth Circuit—have held that the *Noerr-Pennington* Doctrine applies to grant immunity to antitrust claims arising from pre-litigation communications. *Cardtoons* did refuse, however, to extend *Noerr-Pennington* immunity beyond the antitrust context to bar common-law claims arising from pre-litigation communications. *See Cardtoons*, 208 F.3d at 889-90.

Defendants argue that even if the Court applies *Noerr-Pennington* to this case, RaceTech's communications fall within the "sham" exception to the *Noerr-Pennington* Doctrine. (Defs.' Resp. 17-18). This narrow exception requires that the substance of the petitioning activity or communications must be "objectively baseless" or "patently frivolous" and must be intended to conceal and interfere with a business relationship to obviate immunity. *See Octane*, 134 S. Ct. at 1755; *Rondigo LLC v. Twp. of Richmond*, Civ. 08-10432, 2012 WL 1033360, at *6 (E.D. Mich. Feb. 6, 2012), *report and rec. adopted*, 2012 WL 1021726 (Mar. 27, 2012), *aff'd*, 522 F. App'x 283 (6th Cir. 2013). Actions advocated under this analysis must be both objectively meritless and subjectively motivated with knowledge of the lack of merit. *See Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 50 (1993) ("Only if challenged litigation is objectively meritless may a court examine the litigant's subjective motivation."). *See also Static Control Components v. Lexmark Int'l, Inc.*, 697 F.3d 387, 408 (6th Cir. 2012) (internal quotation marks omitted) ("Static Control does not offer any allegations upon which we can plausibly conclude that the copyright action was objectively meritless.").

The Court finds that the communications to Encore allegedly induced by RaceTech from Equibase and Monarch were not objectively baseless or patently frivolous.[6] First, the letters from Equibase quote from a license agreement between it and Encore regarding an affirmative representation that Encore was "properly authorized by the relevant host racetracks to display video replays" of races. (Answer & Am. Countercl. Ex. H, at 2-3). Equibase requested confirmation that Encore had obtained the referenced authorization. (Answer & Am. Countercl. Ex. H, at 1-3). These same authorizations (or lack thereof) are likewise the subject of the

---

[6] Although Encore also alleges RaceTech contacted Axcis, there is no substance provided regarding the content of the communication or any improper action supposedly taken by Axcis. There is thus no plausible claim that any communication to or from Axcis was part of a sham.

Monarch letter. (Answer & Am. Countercl. Ex. J, at 1, DN 17-10). Instead of confirming permission from the host tracks or producing some form of authorization, Encore demanded that Monarch identify its specific authority for claiming that any such authorization was necessary, but received no response. (Answer & Am. Countercl. ¶¶ 49-50). Monarch's alleged failure to respond to Encore's demand for the basis of its cease and desist letter, however, does not render that demand objectively baseless or patently frivolous. Indeed, Encore incorporates into its counterclaim the correspondence from Equibase indicating that Encore had specifically represented and warranted that it was authorized by the host tracks to display video replays of their races. (Answer & Am. Countercl. Ex. H). Significantly, Encore fails to challenge Equibase's quote from their agreement, nor does it claim to have made any such denial directly to Equibase. Most importantly, Encore makes no claim that it actually has authority from the host racetracks. Since it appears that Encore represented to Equibase that it had authorization from the host tracks and that the host tracks have denied such authority was given, the alleged communications by RaceTech which prompted the letters from Equibase and Monarch cannot be considered patently frivolous.

Likewise, the communications from RaceTech to HBPA do not appear to be baseless. The content of these communications relate that tracks, owners, and jockeys are paid a portion of the wagers made through RaceTech's INSTANT RACING, but that no such commission is paid to the horsemen by Encore. (Answer & Am. Countercl. Ex. K, at 1-3, DN 17-11). There are no allegations in the counterclaim contradicting this information. Further, Defendants complain that RaceTech told HBPA that Encore was using the names of the horses and jockeys in its iteration of historical racing, which Defendants explicitly deny in their counterclaim. (Answer & Am. Countercl. ¶¶ 53-54). In their response, Defendants again disavow their use of the names of the

11

horses and jockeys, but then concede that the names of the horses and jockeys *are* provided to the bettors as part of its gaming system. (Def. Resp. 26 ("[A]fter a wager is completed, the bettor may view the names of horses and jockeys in the race on which he or she placed a wager . . . .")). This admission dictates that the information provided by RaceTech to HBPA was not objectively baseless.

Having concluded that none of RaceTech's alleged communications to third parties were a sham, the *Noerr-Pennington* Doctrine applies to defeat federal antitrust claims based upon those communications. For this reason, the Defendants' claims asserted under Section 2 of the Sherman Antitrust Act are dismissed.

### B. KRS 367.175(1)-(2)

The Court must next address Defendants' claims under the Kentucky Consumer Protection Act, KRS 367.175(1)-(2), which Kentucky courts have interpreted as being analogous to Sections 1 and 2 of the Sherman Antitrust Act.[7] *See Mendell v. Golden-Farley of Hopkinsville, Inc.*, 573 S.W.2d 346, 348-49 (Ky. App. 1978). In this regard, Kentucky courts have also adopted the *Noerr-Pennington* Doctrine in the context of state law claims. *See Grand Cmtys., Ltd. v. Stepner*, 170 S.W.3d 411, 416 (Ky. App. 2004).

As with the Sherman Antitrust Act claims discussed above, the sham exception does not apply in this case; thus, the *Noerr-Pennington* Doctrine immunizes RaceTech's communications.

---

[7] In relevant part, KRS 367.175 provides:

(1) Every contract, combination in the form of trust and otherwise, or conspiracy, in restraint of trade or commerce in this Commonwealth shall be unlawful.
(2) It shall be unlawful for any person or persons to monopolize, or attempt to monopolize or combine or conspire with any other person or persons to monopolize any part of the trade or commerce in this Commonwealth.

KRS 367.175(1)-(2).

For this reason, the Court need not consider Defendants' KRS 367.175(2) claim any further. Even if Defendants stated an actual injury under KRS 367.175(1), which they do not, the *Noerr-Pennington* Doctrine would immunize RaceTech under this claim as well. Thus, Defendants' claims under the Kentucky Consumer Protection Act will also be dismissed.

    C. **<u>Defendants' Remaining State Law Claims</u>**

Defendants additionally assert Kentucky common law claims that Plaintiff engaged in a civil conspiracy and tortiously interfered with Defendants' business relationship. (Answer & Am. Countercl. ¶¶ 106-116). "Under Kentucky law, tort liability exists for the interference with a known contractual relationship, if the interference is malicious or without justification, or is accomplished by some unlawful means such as fraud, deceit, or coercion." *Steelvest, Inc. v. Scansteel Serv. Ctr. Inc.*, 807 S.W.2d 476, 487 (Ky. 1991) (citations omitted). To prove a claim of civil conspiracy, a plaintiff must prove a defendant:

> (a) does a tortious act in concert with the other or pursuant to a common design with him, or (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or (c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct separately considered, constitutes a breach of duty to the third person.

*James v. Wilson*, 95 S.W.3d 875, 897 (Ky. App. 2002) (citation omitted).

The Sixth Circuit has left open the possibility that the *Noerr-Pennington* Doctrine may extend to state common law claims as well. *See Campbell v. PMI Food Equip. Grp., Inc.*, 509 F.3d 776, 790 (6th Cir. 2007). *See also Beirut Traders Co. v. Nieman Marcus Grp., Inc.*, No. 2:09-CV-11176, 2009 WL 3460674, at *8 (E.D. Mich. Oct. 22, 2009) (holding that the *Noerr-Pennington* Doctrine provided immunity from a tortious inference claim based upon pre-litigation communications asserting trademark rights). More on point, the Kentucky Court of Appeals has immunized communications under *Noerr-Pennington* in an action for tortious

13

interference. *See Stepner*, 170 S.W.3d at 416. Even without *Noerr-Pennington* immunity, however, Defendants' state law claims must fail for the same reasons their federal Section 1 claims fail: Defendants have not alleged an actual injury. In order to state a claim for tortious interference, there must be some proof that a contract or business relationship was adversely affected. *See Steelvest*, 807 S.W.2d at 487. As previously noted, Defendants have pointed to no contract or business relationship which has been actually interfered with and have only established the potential for interference at some point in the future. (Answer & Am. Countercl. ¶ 76). This is insufficient to survive a motion to dismiss regarding Defendants' tortious interference claim.

Defendants must also show some breach of duty or tortious act occurred in order to sustain a claim for civil conspiracy. *See Wilson*, S.W.3d at 897. Defendants' counterclaims are based upon what *might* happen in the future and what RaceTech has *attempted* to do, but have failed to show an actual breach of duty by RaceTech or any of its alleged co-conspirators. Absent allegations of an actual breach, Defendants have failed to state a claim for either civil conspiracy or tortious interference with a business relationship. *See Walt Peabody Advert. Serv., Inc. v. Pecora*, 393 F. Supp. 328, 331 (W.D. Ky. 1974) (noting that elements of a tortious inference claim include a breach by a third party and resulting damage) (citation omitted). For these reasons, Defendants' remaining counterclaims are dismissed.

## V.     CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED** that Plaintiff's Motion for Leave to File Overlength Reply (DN 33) and Plaintiff's Motion to Dismiss Defendant's Amended Counterclaims (DN 22) are **GRANTED**, and Defendants' Counterclaims are **DISMISSED WITHOUT PREJUDICE**.

**Greg N. Stivers, Judge**
**United States District Court**
March 11, 2016

cc:     counsel of record

15